UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROBERT E. DIAMOND, JR. *and* ATLAS MERCHANT
CAPITAL LLC,

                                             Plaintiffs,

                        -v-

TRILLER GROUP, INC.,

                                             Defendant.

25 Civ. 129 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

This case involves claims brought by the former board chair of a publicly traded financial

services company against the company itself.

Robert E. Diamond, Jr. and his consulting company, Atlas Merchant Capital LLC

("Atlas," and together with Diamond, "plaintiffs") sue Triller Group, Inc. ("Triller" or "the

Company"). Diamond chaired Triller's board after its October 2024 merger with AGBA Group

Holding Ltd ("AGBA") until his resignation in December 2024. Before the merger, Diamond

had headed AGBA's board.

Diamond here centrally claims that he was constructively discharged by Triller, which, he

asserts, denied him information necessary to discharge his board duties. Largely on this basis, he

seeks to recover money damages and stock that he claims he would have been due under written

agreements had he remained a board member. He and Atlas separately seek compensation that

they were due for services rendered before Diamond's resignation, including before the merger.

Triller now moves to dismiss portions of Diamond and Atlas's six-count Amended

Complaint, under Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the

Court dismisses Diamond's claims to the extent premised on the claim of a constructive

discharge, but largely sustains Diamond and Atlas's claims based on services rendered before Diamond's resignation.

## I. Background[1]

### A. Factual Background

#### 1. The Parties

*Plaintiffs*: Diamond is a citizen of New York. AC ¶ 21. He is a former chief executive officer of Barclays Bank, PLC. *Id.* ¶ 23. Atlas is a limited liability company whose members are citizens of New York, New Jersey, and Canada. *Id.* ¶ 26. Diamond co-founded Atlas and, since 2013, has served as its chief executive officer. *Id.* ¶¶ 21–23.

*Defendant*: Triller is a Delaware corporation with its principal place of business in California. *Id.* ¶ 24. On October 15, 2024, Triller merged with AGBA. *Id.* ¶ 25. The merged company remained known as Triller. *Id.*

#### 2. The 2023 and 2024 Agreements

In September 2023, AGBA, a financial services company, sought to expand its business, with the goal of establishing a global presence. *Id.* ¶ 30. It entered into a series of agreements with Diamond, whom it appointed to its board, and Atlas, Diamond's consulting company. *Id.* ¶ 31.

---

[1] The Court draws the facts in this decision principally from the Amended Complaint ("AC"), Dkt. 17. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."). For purposes of resolving the motion to dismiss under Rule 12(b)(6), the Court accepts all factual allegations in the AC as true, drawing all reasonable inferences in plaintiffs' favor. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

*a.*      *The Atlas Advisory Agreement*

On September 2, 2023, AGBA and Atlas entered into the Atlas Advisory Agreement.[2]

Under it, Atlas agreed to give AGBA strategic advice, including identifying transaction targets,

conducting diligence, and advising on the regulatory, transactional, and capital raising processes.

*Id.* ¶¶ 9, 33.

*b.*      *The First Director Services Agreement*

Also on September 2, 2023, AGBA and Diamond entered into the First Director Services

Agreement. Dkt. 17-1 ("FDSA"). Under it, Diamond was appointed chairman of AGBA's

board, succeeding Wing-Fai Ng. *Id.* ¶¶ 35–36. It provided that Diamond was to serve beginning

on September 2, 2023, and continuing until Diamond's resignation, termination pursuant to

written notice, or other date on which he "cease[d] to serve on the Board for any reason." FDSA

§ 1.1. In exchange for his services, Diamond was to receive an annual "Director Fee" of $1

million, to be paid in pro-rata equal monthly installments, and was eligible to receive grants of

equity as approved by the board. *Id.* §§ 2.1–2.2.

The FDSA includes a termination provision. It provides that:

> Upon a termination by the Company of Director's service provider relationship
> other than for "Cause" . . . prior to the one-year anniversary of the Effective Date
> [defined as September 2, 2023], the Company shall pay or provide to Director in a
> lump sum payment within ten (10) days following such termination, or at such other
> time prescribed by law, an amount equal to the Director Fee multiplied by a
> fraction, the numerator of which is the number of days remaining from such
> termination date until the one-year anniversary of the Effective Date and the
> denominator of which is 365.

*Id.* § 3. The FDSA states that it "represents the [parties'] entire agreement and understanding . . .

relating to the subject matter hereof, and merges and supersedes all prior and contemporaneous

---

[2] The AC cites alternative dates when the Atlas Advisory Agreement was executed: September 2,
2023, *id.* ¶ 9, and September 19, 2023, *id.* ¶ 32. This discrepancy does not alter the ensuing
analysis.

discussions, agreements and understandings of every nature relating to Director's service provider relationship with the Company," and that it "may not be changed or modified, except by an agreement in writing signed by each of the Parties." *Id.* § 6.10.

        *c.*     *The Letter Agreement*

      Diamond and Atlas helped identify Triller as a viable merger target for AGBA. AC ¶ 37. On October 9, 2023, AGBA and Atlas entered into a letter agreement, Dkt. 17-2 ("LA"), under which Atlas would provide AGBA strategic advisory services in connection with the potential acquisition, AC ¶ 10. Under the LA, AGBA agreed "to bear [X]% of all Transaction Expenses" up to $1 million incurred by Atlas in relation to the potential acquisition. LA § 1. It added that AGBA would have the right to invest "an amount of capital representing not less than [X%] of the total capital raised by the Purchase(s) to finance the Transaction." *Id.* § 2. The version of the LA attached to the AC does not identify the percentages, if any were agreed to, that the parties intended be used in lieu of the placeholder "X." The AC, however, alleges that under the LA, "AGBA agreed to bear all out-of-pocket expenses incurred by Atlas up to a cap of $1,000,000," AC ¶ 39, implying that the parties understood X% to equate to 100%. The LA is signed by Timothy Kacani, Atlas's chief operating officer, and Ng. LA at 2.

      During its work under the LA, Atlas incurred, on AGBA's behalf, $691,039.19 in out-of-pocket expenses. AC ¶ 40. Atlas claims that AGBA never reimbursed it for those expenses. *Id.*

        *d.*     *The Merger Agreement*

      On April 16, 2024, AGBA and Triller entered into an initial Merger Agreement. *Id.* ¶ 42. On August 30, 2024, AGBA and Triller entered into an Amended and Restated Merger Agreement. *Id.* ¶ 51. On October 15, 2024, the merger closed and the merged entity took on Triller's name. *Id.* ¶ 57.

### e.    The Share Grant Resolution

On July 19, 2024, AGBA's board approved a Share Grant Resolution, memorialized in the board's meeting minutes for that day. Dkt. 17-3 ("SGR"). It awarded Diamond and Ng 15 million shares of AGBA apiece. AC ¶ 47. In August 2024, AGBA stockholders approved the SGR. *Id.* ¶ 49. Although the meeting minutes do not address the reason for the grant, plaintiffs allege that AGBA's board awarded the shares to Diamond in exchange for his commitment not to resign from AGBA's board and to continue to advise AGBA on the merger with Triller, then in progress. *Id.* ¶¶ 47–48. Under the SGR, 10 million of Diamond's shares were to vest when the merger closed, with the balance vesting during the next two years. SGR at 2.

### f.    The Second Director Services Agreement

On October 1, 2024, AGBA and Diamond entered into a Second Director Services Agreement. Dkt. 17-4 ("SDSA"). It governs the relationship between AGBA and Diamond and, plaintiffs state, was intended to cover their relationship following AGBA's anticipated merger with Triller. AC ¶ 52. To that end, the SDSA, by its terms, covers the period beginning October 1, 2024, and continuing, as in FDSA § 1.1, until Diamond's resignation, termination pursuant to written notice, or other date on which he "cease[d] to serve on the Board for any reason." SDSA § 1.1. The SDSA defined Diamond's obligations to AGBA identically to the FDSA, *compare* FDSA § 2, *with* SDSA § 2, and again identified Diamond as a non-employee independent contractor, *compare* FDSA § 2.4, *with* SDSA § 2.4.

As to compensation, as under the FDSA, Diamond was to receive a $1 million annual director fee, to be paid in pro rata equal monthly installments. SDSA § 2.1. In addition, the SDSA provided that Diamond was to receive an annual equity award, valued at $1 million, awarded in pro rata monthly installments, *id.*, and was eligible to receive "incentive

compensation" as determined by the board's compensation committee "from time to time," with the first award being granted as of December 31, 2024 and valued at least $2 million, *id.* § 2.2.

The SDSA also includes a Termination provision. It is identical to that in the FDSA, save that it defines the effective date as October 1, 2024. *Compare* FDSA § 3, *with* SDSA § 3. The SDSA contains an "entire agreement" clause, which also tracks that of the FDSA. *See* SDSA § 6.10.

### 3. AGBA and Triller's Dealings with Diamond, and Diamond's Resignation

The AC alleges that AGBA's management before the merger, and Triller's management after it, failed to engage with Diamond, and denied him information necessary to carry out his fiduciary duties as a board member. These actions, the AC alleges, breached the respective companies' agreements with Diamond and ultimately effected a constructive discharge of him. AC ¶ 43. The AC alleges several instances in which Diamond was denied information.

*June 2024 approval of line of credit*: In June 2024, AGBA's management asked Diamond to approve a line of credit for AGBA in relation to the pending merger, but did not provide him with background or supporting documentation. *Id.* ¶ 44. AGBA's failure to provide Diamond "the information he needed related to AGBA's management and oversight," the AC alleges, was "sufficient grounds for Diamond to terminate the FDSA and walk away." *Id.* ¶ 46. It alleges that, to ensure that the line of credit was in stockholders' best interests, Diamond "ensured there were 'guarantees of the line of credit from non-affiliated entities prior to approving the transaction.'" *Id.* ¶ 45. The AC alleges that the decision the next month by AGBA's board to approve the SGR, awarding Diamond 15 million shares, was taken to dissuade him from resigning while the merger was pending. *Id.* ¶ 47.

*October 2024 extension of loan to controlling shareholder*:  After the merger, the AC alleges, Triller's management withheld information from the board and refused to seek its input on "significant actions." *Id.* ¶ 61.  In October 2024, for example, Triller's management entered into a loan agreement with its controlling shareholder, Taiwanese billionaire Richard Tsai, pledging as collateral five million shares of common stock in a separate company ("Bare Knuckles Fighting Championship," or "BKFC") of whose equity Triller owned 76%. *Id.* ¶¶ 62–64.  Management did not inform the board, including Diamond, of the pledge of five million shares to Tsai. *Id.* ¶ 65.  The AC alleges that management thereby "intentionally prevented Mr. Diamond from reviewing the terms of the loan agreement" with Tsai, impeding his "ability to fulfill his fiduciary obligation to Triller's stockholders and to prevent [Triller] from engaging in self-dealing transactions." *Id.* ¶ 66.

*November 2024 termination of CEO*:  The AC alleges that, on November 15, 2024, a month after the merger closed, Triller's management terminated the merged company's chief executive officer, Kevin McGurn, without giving the board an opportunity to review the termination letter.[3] *Id.* ¶ 67.  The termination letter contained "factual misstatements as to employment actions . . . [that] Mr. Diamond could have corrected." *Id.* ¶ 68.  Triller management, the AC alleges, "ignored" Diamond's ensuing requests for financial information from the company's acting CEO or chief financial officer. *Id.* ¶ 69.

*SEC filings*:  The AC further alleges that Triller management made public filings with the Securities and Exchange Commission, but, despite Diamond's requests to review these in

---

[3] The AC does not explain how Triller's management, which would ordinarily be led by its CEO, terminated the CEO without board involvement.

advance to assure compliance with securities laws, did not give the full board "a meaningful opportunity to review and comment on those filings." *Id.* ¶¶ 70–71.

*November 2024 creditor lawsuit*: After the merger, the AC alleges, Diamond received calls from vendors of Triller, claiming they had not been paid. *Id.* ¶ 72. On November 26, 2024, a creditor sued Triller and its subsidiaries, claiming default of various agreements and seeking more than $35 million in damages. *Id.* ¶ 73. That action is pending. *See YA II PN, Ltd. v. Triller Group Inc.*, Index No. 659314/2024, Dkt. 90 (N.Y. Sup. Ct. May 20, 2025) (ordering start to discovery and scheduling preliminary conference).

On December 12, 2024, Diamond submitted a letter to Triller's board, resigning as a director and board chair, and terminating the Atlas Advisory Agreement. AC ¶ 74. The letter stated that Diamond had taken his role as board chair seriously and had attempted to address deficiencies in Triller's governance practices, but that he had "seen no meaningful or satisfactory improvements," and that, due to the "lack of effective Board process," it had proven "impossible to effectively carry out and perform many of my duties as a member of the Board." Dkt. 17-5 ("Resig. Ltr.") at 1–2. It stated that management had denied him the information necessary to carry out his fiduciary duties. *See id.*

This lawsuit followed. In it, Diamond and Atlas claim that they complied with their contractual obligations. *See, e.g.*, AC ¶¶ 2, 16, 55. But, they claim, management of AGBA and Triller constructively terminated Diamond and failed to pay him and/or Atlas money and/or equity as required by the above agreements. *See, e.g., id.* ¶¶ 87–100.

### B.    Procedural Background

On January 7, 2025, plaintiffs filed the Complaint. Dkt. 1. On February 28, 2025, Triller moved to dismiss portions of the Complaint. Dkt. 13. On March 3, 2025, the Court issued an

order, giving plaintiffs an opportunity to amend in response to the motion to dismiss, while cautioning that a further opportunity to amend would not likely be granted. Dkt. 16.

On March 21, 2025, plaintiffs filed the AC, the operative complaint today. Dkt. 17. It contains six counts. *Id.*

Count One alleges breaches of the FDSA and SDSA. AC ¶¶ 86–100. It claims that Triller failed to pay Diamond compensation, totaling $448,923.73, for the period between July 1, 2024 and December 12, 2024, the date of his resignation. *Id.* It further claims that Triller constructively discharged Diamond, preventing him from obtaining compensation to which he would have become entitled. *Id.* This pay, it contends, consisted of director's fees for the period December 12, 2024 through October 31, 2025 ($800,000), 2024 bonus compensation ($2 million), and common stock (valued at $708,333.33). *Id.*

Count Two alleges breach of the implied covenant of good faith and fair dealing implied in those same agreements. *Id.* ¶¶ 101–05.

Count Three alleges that Triller breached the SGR by failing to provide Diamond with common Triller stock he is owed. *Id.* ¶¶ 106–18. It claims Diamond is entitled to 5,950,705 shares of such stock, at an amount to be valued at trial. *Id.*

Count Four, brought on behalf of Atlas, claims breaches of the Atlas Advisory Agreement. *Id.* ¶¶ 119–26. It claims that Triller failed to pay Atlas monthly service fees of $83,333, a success fee triggered by the completion of the merger, and reimbursement for out-of-pocket expenses. *Id.* These, it alleges, total not less than $1 million. *Id.*

Count Five, also brought on behalf of Atlas, alleges breach of the LA. *Id.* ¶¶ 127–32. It alleges that Triller failed to repay out-of-pocket expenses, totaling $691,039.19. *Id.*

Finally, Count Six seeks recovery under a theory of quantum meruit, as an alternative to the claims in Counts One through Five. *Id.* ¶¶ 133–43.

On April 11, 2025, Triller filed a partial motion to dismiss the AC under Rule 12(b)(6) for failure to state a claim, Dkt. 18, and a supporting memorandum of law, Dkt. 19 ("Def. Br."). Triller moves for partial dismissal of Counts One and Six and full dismissal of Counts Two, Three, and Five. Def. Br. at 6–16, 24–25. It does not move to dismiss, in whole or part, Count Four. On May 2, 2025, after an extension, plaintiffs opposed Triller's motion to dismiss. Dkt. 22 ("Pls. Br."). On May 16, 2025, Triller replied. Dkt. 23 ("Def. Reply").

## II.    Legal Standard Under Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), the AC must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Accordingly, a district court must accept as true all well-pleaded factual allegations in the complaint and draw all inferences in the plaintiffs' favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). The Court need not accept legal conclusions asserted in the AC as true. *Iqbal*, 556 U.S. at 678.

## III.   Analysis

### A.     Count One: Breach of the FDSA and SDSA

Triller moves to dismiss in part Count One, which claims a breach of the FDSA and SDSA. In Count One, Diamond seeks three forms of damages: (1) a director fee covering the period between July 1, 2024 and Diamond's resignation on December 12, 2024, when he was a

director, first of AGBA and, after the merger closed on October 15, 2024, of Triller, AC ¶¶ 85(a), 91; (2) a termination fee, based on the claim that Triller constructively discharged him, *id.* ¶¶ 85(b), 92–94; and (3) incentive compensation and a director equity award covering the period after Diamond's resignation, again on the theory that he was constructively discharged, *id.* ¶¶ 85(c)–(d). In moving to partially dismiss Count One, Triller makes two distinct arguments: first, that Diamond may seek relief only under the SDSA, because it supersedes the FDSA; and second, that Diamond has not viably pled that he was constructively discharged, thus precluding the forms of relief premised on discharge.

The Court considers these arguments in turn, in light of the legal standards governing breach of contract claims. "To state a claim in federal court for breach of contract under New York law,[4] a complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996); *see also Edwards v. Sequoia Fund, Inc.*, 938 F.3d 8, 12 (2d Cir. 2019).

### 1.      FDSA Versus SDSA

Triller first argues that the FDSA has been extinguished by the SDSA and thus cannot support a claim for breach of contract. Def. Br. at 6. Diamond counters that he may seek relief under both agreements. Pls. Br at 9. This dispute implicates one category of relief Diamond seeks: director's fees. The FDSA provides that,"[c]ommencing on the Effective Date [of September 2, 2023], Director shall receive an annual fee . . . of $1,000,000.00," FDSA § 2.1, payable in pro rata monthly installments, whereas the SDSA, while otherwise using the same

---

[4] The FDSA and SDSA are both governed by New York law. *See* FDSA § 6.6.1; SDSA § 6.6.1.

language, has an effective date of October 1, 2024, *see* SDSA § 2.1.[5] Insofar as Diamond seeks

director fees dating to July 1, 2024, this dispute implicates Diamond's entitlement to fees for the

three-month period of July 1, 2024 through October 1, 2024.

Generally, under New York law, "a subsequent contract regarding the same subject

matter supersedes the prior contract." *CreditSights, Inc. v. Ciasullo*, No. 5 Civ. 9345, 2007 WL

943352, at *6 (S.D.N.Y. Mar. 29, 2007) (citation omitted); *see also Mumin v. Uber Techs., Inc.*,

239 F. Supp. 3d 507, 524 (E.D.N.Y. 2017) (applying New York law) ("It is a well settled

principle of contract law that a new agreement between the same parties on the same subject

matter supersedes the old agreement." (citation omitted)).

In determining whether a subsequent contract regards the same subject matter, courts

consider: "(1) whether there is an integration and merger clause that explicitly indicates that the

prior provision is superseded; (2) whether the two provisions have the same general purpose or

address the same general rights; and (3) whether the two provisions can coexist or work in

tandem." *Dewitt Stern Group, Inc. v. Eisenberg*, 257 F. Supp. 3d 542, 581–82 (S.D.N.Y. 2017)

(quoting *Long Side Ventures, LLC v. Adarna Energy Corp.*, No. 12 Civ. 6836, 2014 WL

4746026, at *6 (S.D.N.Y. Sept. 24, 2014)). "When the parties to a contract enter into a new

agreement that expressly supersedes the previous agreement, the previous agreement is

extinguished, thereby reducing the remedy for breach to a suit on the new agreement." *Health-*

*Chem Corp. v. Baker*, 915 F.2d 805, 811 (2d Cir. 1990); *see also Nat'l Lab. Rels. Bd. v. Newark*

*Electric Corp.*, 14 F.4th 152, 166 (2d Cir. 2021) ("Under New York's common-law doctrine of

contract merger, when parties who have entered first into one agreement subsequently enter into

---

[5] The other relief that Diamond seeks in Count One is sought pursuant to the SDSA and thus is
not implicated by this argument.

a second regarding the same subject matter, the first agreement 'merges' with the second, and the terms of the second agreement control[.]" (citation omitted)).

Applying these standards, Triller is correct that the SDSA supersedes and extinguishes the FDSA. The two agreements at issue address the same subject: the terms of Diamond's service as chairman of the board of AGBA. *See* FDSA at 1 ("The parties desire and intend for the Director to serve as the Chairman of the board of directors of the Company . . . upon the terms and conditions set forth herein."); SDSA at 1 (same). And the agreements contain very similar provisions, including compensation, termination, and responsibilities. In many respects, the terms and wording of the two contracts are identical. *See, e.g.*, FDSA § 1.1 ("The term of this Agreement will commence on the Effective Date and shall continue until terminated in accordance with this Section 1.1"); SDSA § 1.1 (same); FDSA § 1.2.1 ("During the Term, Director will . . . : (i) serve as . . . Chairman of the Board; (ii) [serve] in Director's capacity as a director on the Board, provide advice and mentoring to senior management; (iii) serve as a consultant to the Company . . . , (iv) serve as a member of one or more committees of the Board . . . ; and (v) attend meetings of the Board[.]"); SDSA § 1.2.1 (same); FDSA § 2.3 ("Director may be eligible to receive a grant of certain securities, restricted stock units or options of the Company pursuant to the Company's shares and options schemes . . . and subject to the approval of the Board of Directors and shareholders[.]"); SDSA § 2.2 (same). The two materially differ only in two respects: that the SDSA (1) provides a later start date for the accrual of director's fees and (2) provides for additional forms of compensation (incentive compensation and a director's equity award).

That the two agreements concern the same subject matter would alone establish that the SDSA supersedes the FDSA. *See, e.g.*, *Applied Energetics, Inc. v. NewOak Cap. Mkts.*, 645 F.3d

522, 526 (2d Cir. 2011) (later contract regarding same subject matter superseded prior contract); *Barnum v. Millbrook Care Ltd. P'ship*, 850 F. Supp. 1227, 1236 (S.D.N.Y.), *aff'd*, 43 F.3d 1458 (2d Cir. 1994) (same); *DeSouza v. Andy Frain Servs., Inc.*, No. 12 Civ. 1308, 2012 WL 3245496, at *3 (S.D.N.Y. Aug. 6, 2012) (same); *Thayer v. Dial Indus. Sales, Inc.*, 85 F. Supp. 2d 263, 268 (S.D.N.Y. 2000) (same). But the SDSA goes beyond that to include a merger and integration clause, which explicitly so states:

> This Agreement and the Indemnification Agreement represents the entire agreement and understanding of the Parties *relating to the subject matter hereof,* and *merges and supersedes all prior and contemporaneous discussions, agreements* and understandings of every nature relating to Director's service provider relationship with the Company.

SDSA § 6.10 (emphasis added). Where both agreements relate to the same subject matter, and there is a facially unambiguous merger clause, the Court is bound to interpret the later agreement as superseding the earlier. *See, e.g., L. Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) ("The objective of contract interpretation is to give effect to the expressed intentions of the parties, and the best evidence of what parties to a written agreement intend is what they say in their writing." (cleaned up)); *Vill. of Sylvan Beach, N.Y. v. Travelers Indem. Co.*, 55 F.3d 114, 115 (2d Cir. 1995) ("If the provisions are clear and unambiguous, courts are to enforce them as written."); *Walmart Inc. v. Cap. One, Nat'l Ass'n*, 725 F. Supp. 3d 450, 463 (S.D.N.Y. 2024) ("Where a contract is unambiguous, courts apply the 'plain meaning' of its terms as written." (citation omitted)).

It follows that Diamond may not bring claims under the FDSA. *See Silverberg v. SML Acquisition LLC*, No. 15 Civ. 7129, 2017 WL 758520, at *5 (S.D.N.Y. Feb. 27, 2017) ("[W]here the parties have clearly expressed or manifested their intention that a subsequent agreement supersede or substitute for an old agreement, the subsequent agreement extinguishes the old one

and the remedy for any breach thereof is to sue on the superseding agreement."). The Court

accordingly dismisses Count One to the extent it alleges a breach of the FDSA. This ruling does

not affect Count One to the extent it alleges a breach of the SDSA.[6]

### 2.    Constructive Discharge

Triller next argues that the AC does not plausibly allege constructive discharge. This

dispute affects Count One's claims under the SDSA for (1) director's fees for the period after

Diamond's resignation, AC ¶ 94, (2) bonus compensation for 2024, *id.* ¶¶ 95–96, and (3) equity

compensation for the period between October 15, 2024 and June 20, 2025, *id.* ¶ 98.

A "constructive discharge occurs when the employer, rather than acting directly,

deliberately makes an employee's working conditions so intolerable that the employee is forced

into an involuntary resignation." *Williams v. Geiger*, 447 F. Supp. 3d 68, 86 (S.D.N.Y. 2020)

(quoting *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983)). "In determining

whether or not a constructive discharge has taken place, 'the trier of fact must be satisfied that

the . . . working conditions would have been so difficult or unpleasant that a reasonable person in

the employee's shoes would have felt compelled to resign.'" *Pena*, 702 F.2d at 325 (quoting

---

[6] Diamond argues that the two agreements are complementary, because, as to director's fees, the time periods they cover are not fully synchronous. *See* Pls. Br. at 9. That argument does not preserve claims under the FDSA. The agreements clearly cover the same subject matter: Diamond's service as a director and his fees for such service. And their fee provisions cover periods that substantially overlap (October 1, 2024 forward indefinitely). Moreover, in its merger clause, the SDSA expressly supersedes prior agreements relating to the same subject matter. To the extent that Diamond implies it would not have been rational for him to enter into an agreement foregoing as-yet unpaid fee compensation for the period uniquely covered by the FDSA, the record before this Court does not establish whether or not Diamond had been paid for his director service before October 1, 2024. And the SDSA furnished Diamond with potential benefits (*e.g.*, incentive compensation and a director equity award) not provided by the FDSA. In any event, it is not for the Court to rewrite a textually clear agreement entered into by willing participants. *See KB Dissolution Corp. v. Great Am. Opportunities, Inc.*, No. 9 Civ. 8565, 2010 WL 1223154, at *2 (S.D.N.Y. Mar. 19, 2010) ("It is not for the Court to rewrite the parties' agreements to favor either side."); *Hall v. Paramount Pictures Corp.*, No. 97 Civ. 3553, 2002 WL 1858766, at *10 (S.D.N.Y. Aug. 14, 2002) (similar).

*Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir. 1977)). Additionally, the employer's conduct must have been deliberate, specific to the employee, and not merely negligent. *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 74 (2d Cir. 2000); *see also Petrosino v. Bell Atl.*, 385 F.3d 210, 229 (2d Cir. 2004). In other words, "constructive discharge cannot be proven merely by evidence that an employee . . . preferred not to continue working for that employer or that the employee's working conditions were difficult or unpleasant." *Miller v. Praxair, Inc.*, 408 F. App'x 408, 410 (2d Cir. 2010) (summary order) (citation omitted).

Diamond's claim of constructive discharge is problematic at the threshold because he was not an employee. To the contrary, the SDSA expressly denominated him as a *non-employee* independent contractor, *see* SDSA § 2.5 (entitled "No Employee Relationship / Independent Contractor Status"), as had the FDSA, *see* FDSA § 2.5. And Diamond's sole title, as member of the board of directors, ordinarily connotes a fiduciary, not an employee, role. *See, e.g., Katz v. Sullivan*, 791 F. Supp. 968, 982 (E.D.N.Y. 1991) ("[D]irectors of corporations in their capacity as such are not employees of the corporations."). The doctrine of constructive discharge, however, which is rooted in employment law, presupposes an employer-employee relationship. *See Toledo v. Brend Restoration, LLC*, No. 21 Civ. 882, 2023 WL 3381249, at *3 (S.D.N.Y. May 11, 2023) ("[C]onstructive discharge requires deliberate action *by an employer*" and cannot prevail "[w]ithout an employer-employee relationship." (emphasis added) (citation omitted)); *Multi-Juice, S.A. v. Snapple Beverage Corp.*, No. 2 Civ. 4635, 2003 WL 1961636, at *4 (S.D.N.Y. Apr. 25, 2003) ("Because no employment relationship between Snapple and Multi–Juice exists in this case, Plaintiff's constructive termination claim is invalid and consequently dismissed."); *see also Green v. Brennan*, 578 U.S. 547, 555 (2016) ("The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee[.]").

Diamond has not identified any case or authority holding that a non-employee, let alone the chairman of a corporate board, can claim constructive discharge.

Even assuming *arguendo* that this line of doctrine were available to a person holding Diamond's director post, the AC, for two independent reasons, does not plead facts plausibly supporting a claim of constructive discharge.

First, the circumstances that Diamond alleges he confronted at Triller fall far from the intolerable circumstances necessary to support a constructive discharge claim. The AC pleads that Diamond was denied information by management that would have enabled him to ably discharge his fiduciary duties. But these circumstances are a far cry from those described in the few cases on which Diamond relies. In those cases, employees were directed "to perform illegal acts" and it was thereby "impossible for [them] to perform the work anticipated by the employment agreement." *Hertzoff v. Diaz*, 533 F. Supp. 2d 470, 473 (S.D.N.Y. 2008) (employee instructed by superior to engage in illegal billing activities); *see also Dewelt v. Measurement Specialties, Inc.*, No. 2 Civ. 431, 2007 WL 542234, at *1 (D.N.J. Feb. 16, 2007) (employee instructed to engage in fraudulent activity by superior).[7] Diamond's AC does not allege anything of the sort.

The AC instead alleges three instances after the October 15, 2024 merger in which management did not share information with Diamond that would have assisted in discharging his

---

[7] Also unhelpful to Diamond's cause is *Valleriani v. Route 390 Nissan LLC*, 41 F. Supp. 3d 307, 321 (W.D.N.Y. 2014), on which Diamond also relies. The plaintiff-employee there testified that her supervisor had yelled at her "[b]ecause [she] wouldn't commit blatant bank fraud," but the court ultimately held that verbal abuse not to support a constructive discharge claim. *Id.* Here, Diamond does not even allege that he was subject to any form of abuse, verbal or otherwise.

board duties.[8]  In October 2024, Diamond was not informed of a pledge of shares to controlling

shareholder Tsai pursuant to a loan agreement, AC ¶¶ 64–66; in November 2024, management

terminated CEO McGurn without giving the board an opportunity to review the termination

letter, *id.* ¶¶ 67–68; and on unspecified dates, the AC made public filings under the securities law

without giving Diamond the opportunity he had requested to first review these, *id.* ¶¶ 70–71.  But

that is all.[9]

      The AC, notably, does not allege that Diamond did anything other than request the above

information in vain.  It does not allege that he took any other step to secure it.  It does not allege

that Diamond notified, consulted, or enlisted the support of any fellow board member about his

concerns; that he determined that any board member shared his concerns; that he reported any of

the above situations to Triller's CEO, general counsel, or compliance head; that he made a

formal demand for any such information; or that he took, or even threatened, legal action.  And

the AC does not allege that Diamond gave the post-merger company much time to right itself

before deciding to quit.  He quit less than two months after the merger closed, and this damages

action followed less than four weeks later.  "[C]ourts in this circuit generally have refused to find

a constructive discharge where an employee had an avenue through which he could seek redress

---

[8] The AC alleges that on one occasion before the merger, in June 2024, AGBA's management
failed to supply Diamond with documentation he needed—bearing on a request for approval of a
line of credit.  AC ¶ 44.  It is unclear to the Court what relevance that incident, which involved
AGBA four months before the merger, has to Diamond's claim to have been subject to
intolerable circumstances at Triller post-merger.  To the extent the AC means to imply that
Triller's management continued the informational parsimony characteristic of AGBA's,
Diamond's willingness to take on a well-compensated board chair role at Triller suggests that he
did not find this circumstance intolerable.

[9] The AC also alleges that, in November 2024, Triller was sued by a creditor, in a state-court
action that is pending, and that other vendors have told Diamond that they had not been paid.  *Id.*
¶¶ 72–73.  The AC, however, does not allege that management declined to share information
with Diamond about these matters.

for the allegedly 'intolerable' work atmosphere leading up to his resignation, but failed to take advantage thereof." *Dall v. St. Catherine of Siena Med. Ctr.*, 966 F. Supp. 2d 167, 179–80 (E.D.N.Y. 2013) (citation omitted); *see Silverman v. City of New York*, 216 F. Supp. 2d 108, 116 (E.D.N.Y. 2002) ("[T]he fact that [plaintiff] could have sought a hearing before being terminated eviscerates his claim that threats of termination created an 'intolerable' situation which left him with but one choice: resignation."); *see, e.g., Spence v. Md. Cas. Co.*, 995 F.2d 1147, 1156–57 (2d Cir. 1993) (no constructive discharge where plaintiff claimed defendants deliberately attempted to make him ill in order to force him to resign because, *inter alia*, he could have lodged a complaint with human resources about the behavior); *Weisbecker v. Sayville Union Free School Dist.*, 890 F. Supp. 2d 215, 235–36 (E.D.N.Y. 2012) (no constructive discharge where supervisor recommended plaintiff be terminated because, among other things, plaintiff had the "ability to request reasons for the recommendation from [the supervisor] and submit a response"); *Rodriguez v. Graham–Windham Servs. To Families & Children*, No. 99 Civ. 10447, 2001 WL 46985, at *6 (S.D.N.Y. Jan. 18, 2001) (no constructive discharge where plaintiff was demoted because plaintiff was aware of her employer's complaint resolution procedures but made no complaint to human resources alleging discrimination or mistreatment); *Katz v. Beth Israel Med. Ctr.*, No. 95 Civ. 7183, 2001 WL 11064, at *13 (S.D.N.Y. 2001) (no constructive discharge where plaintiff voluntarily resigned after being "unfairly disciplined," yelled at, and threatened with termination at least once, because, among other things, she could have filed a grievance regarding the unfair reprimands).

The AC, although pleading an ineffectual and substandard board process and perhaps Diamond's personal marginalization within the newly constituted company, thus falls very far short of pleading circumstances so difficult "that a reasonable person in the employee's shoes

would have felt compelled to resign." *Pena*, 702 F.2d at 725.  There is no suggestion that board

chairman Diamond was subject to hostility, verbal or physical abuse, degradation, threats,

discomfort, or discrimination based on a protected characteristic.  There is no suggestion that he

had been told that his $1 million compensation package or other perquisites were in jeopardy.

His disquiet in the short period between the merger and his resignation cannot be likened to the

exceptional circumstances that have been held to sustain a constructive discharge claim.  *See,*

*e.g.*, *Andrade v. Cultural Care, Inc.*, 706 F. Supp. 3d 348, 357 (E.D.N.Y. 2023) (constructive

discharge adequately pled where *au pair* plaintiff's employer "install[ed] a hidden camera above

Plaintiff's bed and record[ed] Plaintiff's movements in her bedroom—a room where she was

frequently nude, dressing, and undressing, and rightly expected privacy"); *Atkinson v. Singh*, No.

19 Civ. 3779, 2022 WL 137634, at *14 (S.D.N.Y. Jan. 14, 2022) (same where plaintiff's direct

supervisor "regularly belittled" her with "gendered and misogynistic epithets and phrases");

*Bright-Asante v. Saks & Co., Inc.*, 242 F. Supp. 3d 229, 243–44 (S.D.N.Y. 2017) (same where

Black plaintiff was placed on indefinite leave and forced to find a new job despite white

employee not receiving any sanction for same behavior); *Kassman v. KPMG LLP*, 925 F. Supp.

2d 453, 476–77 (S.D.N.Y. 2013) (same where female plaintiff faced gender harassment, was

denied promotions given to her harassers despite her complaints, needlessly evicted from her

office, and told to leave the company "as other harassed women had done"); *Timothy v. Our*

*Lady of Mercy Med. Ctr.*, No. 3 Civ. 3556, 2004 WL 503760, at *7 (S.D.N.Y. Mar. 12, 2004)

(same where plaintiff had been passed over for positions, demoted, stripped of substantive

responsibilities, removed from her office and "shunted to several inadequate work locations").

     The facts pled in the AC, in fact, pale before the circumstances in numerous cases that

have held *not* to meet the constructive discharge standard.  *See, e.g.*, *Tulino v. Ali*, No. 15 Civ.

7106, 2019 WL 1447134, at *2 (S.D.N.Y. Feb. 27, 2019), *aff'd sub nom. Tulino v. City of New York*, 813 F. App'x 725 (2d Cir. 2020) (constructive discharge inadequately pled where plaintiff resigned after defendant told her employees were expected to engage in sexual activity to advance professionally, and grabbed and tried to kiss her without consent); *Milne v. Navigant Consulting*, No. 8 Civ. 8964, 2009 WL 4437412 (S.D.N.Y. Nov. 30, 2009) (same where supervisors made inappropriate comments to plaintiff, including: "you won't sit on my lap and keep me warm" and "you are not too young for me"); *Noh v. Admarketplace, Inc.*, No. 24 Civ. 2107, 2025 WL 965882, at *1 (S.D.N.Y. Mar. 28, 2025) (same where male employer asked female employee if it was her "time of the month" when the two disagreed, and called her a "good" girl); *Spence*, 995 F.2d at 1149–50, 1156–58 (same where plaintiff's supervisor "constant[ly] critici[zed]," "harangued," and "ranted and cursed" at plaintiff); *LeeHim v. New York City Dep't of Educ.*, No. 17 Civ. 3838 (PAE), 2017 WL 5634128, at *5 (S.D.N.Y. Nov. 21, 2017) (same where plaintiff was excluded from core work, communication streams, and meetings; "ignored and criticized by her supervisors;" and "subjected to an angry tirade").

Second, the AC's allegations do not describe conduct aimed at Diamond specifically. They allege failures—and relatively quotidian ones at that—of management to share information with a corporate board as a collective. *See, e.g.*, AC ¶¶ 61–70 (alleging that Triller "refused to seek Board input," failed to provide "the full Board" with the opportunity to review materials, and made filings "without providing the full Board of Directors a meaningful opportunity to review"). That no other board member is alleged to have resigned or even protested the denial of information undermines any claim that a "reasonable person in the employee's position" would have felt to resign. *Petrosino*, 385 F.3d at 230. And because there is no well-pled allegation that management's assertedly offending conduct was specific to Diamond, as opposed to the entire

board, it, under settled precedent, cannot support a claim of constructive discharge. *See, e.g.,*
*Rasulo v. Hartnett*, 831 F. Supp. 2d 714, 719 (S.D.N.Y. 2011) (constructive discharge not
adequately pled where, *inter alia*, "plaintiff fails to describe a single instance when any one of
the defendants personally accused him of committing any crime"); *Watts v. New York City*
*Police Dep't*, 724 F. Supp. 99, 108–09 (S.D.N.Y. 1989) (same where plaintiff showed that her
employer's actions created a hostile environment, but where no actions were taken directly
against the plaintiff).

Although not necessary to the decision to dismiss the claim of constructive discharge,
that claim is independently problematic to the extent it seeks recovery of incentive compensation
or an equity award. That is because, even had Diamond remained on the board, the SDSA would
not have entitled him to these forms of remuneration on top of his $1 million annual pay. The
SDSA provided that Diamond "*shall be eligible* to receive incentive compensation *as determined*
*by* the Board's Compensation Committee from time to time." SDSA § 2.2 (emphasis added).
And it provided that Diamond "*may* be eligible to receive a grant of certain securities, restricted
stock units or options of the Company . . . *subject to the approval of the Board of Directors and*
*shareholders* (as applicable) from time to time." *Id.* § 2.3 (emphasis added).

This language, conditioning incentive compensation on a decision by the board's
compensation committee and an equity award on a decision by the board and shareholders,
merely made such additional remuneration possible. It did not guarantee it. Under New York
law, however, "damages may not be merely speculative, possible or imaginary, but must be
reasonably certain and directly traceable to the breach, not remote or the result of other
intervening causes." *ADYB Engineered for Life, Inc. v. EDAN Admin. Servs. (Ireland) Ltd.*,
No. 19 Civ. 7800, 2024 WL 2125431, at *13 (S.D.N.Y. May 10, 2024) (quoting *Travellers Int'l,*

*A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1577 (2d Cir. 1994)). Here, the AC does not plead facts supporting, with reasonable certainty, that he would have received such emoluments had he remained on the board. *See Grewal v. Cuneo Gilbert & LaDuca LLP*, No. 13 Civ. 6836, 2018 WL 4682013, at *9 n.15 (S.D.N.Y. Sept. 28, 2018) ("[T]he failure to give [] discretionary bonuses is not generally susceptible to a breach of contract claim[.]"), *aff'd*, 803 F. App'x 457 (2d Cir. 2020) (summary order); *Nevias v. Crystal Vision, LLC*, No. 23 Civ. 7075, 2024 WL 3938262, at *4 (S.D.N.Y. Aug. 26, 2024) ("Under New York law, an employee cannot recover on a breach of contract claim for an employer's failure to pay a bonus when the employer has sole and absolute discretion over the bonus decision."); *see also Bessemer Tr. Co., N.A. v. Branin*, 618 F.3d 76, 92 (2d Cir. 2010) (affirming dismissal of a breach of contract claim for an increased bonus where the bonus provision "reserve[d] to the Salary Committee the decision to award or not to award a bonus, and in what amount"); *Clemens v. Moody's Analytics, Inc.*, No. 17 Civ. 410, 2020 WL 42277, at *3 (S.D.N.Y. 2020) (dismissing breach-of-contract claim seeking payment of contribution units because distribution of such award was at defendant's "sole and absolute discretion"); *O'Grady v. BlueCrest Capital Management LLP*, 111 F. Supp. 3d 494, 502 (S.D.N.Y. 2015) (dismissing breach-of-contract claim seeking bonus payment because the "contract clearly provides that both the bonus program *and* any awards are discretionary" (emphasis in original)); *Gatto v. Fujitec Am., Inc.*, No. 21 Civ. 9754, 2024 WL 4306787, at *10 (S.D.N.Y. Sept. 26, 2024) (similar); *Apple Mortg. Corp. v. Barenblatt*, 162 F. Supp. 3d 270, 292 (S.D.N.Y. 2016) (similar).

The Court accordingly dismisses Count One in part, specifically, to the extent it is based on the FDSA and to the extent it is based on a theory of constructive discharge.

**B.    Count Two: Breach of the Implied Covenant of Good Faith and Fair Dealing**

Triller next moves to dismiss Count Two, which alleges breach of the implied covenant of good faith and fair dealing in relation to the FDSA and SDSA, AC ¶¶ 101–05, as duplicative of Count One.

"New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Nevias*, 2024 WL 3938262, at *7 (quoting *Harris v. Provident Life Ins.*, 310 F.3d 73, 81 (2d Cir. 2002)); *see also Marcus v. W2007 Grace Acquisition I, Inc.*, 203 F. Supp. 3d 332, 340 (S.D.N.Y. 2016) ("Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract." (quoting *Harris*, 310 F.3d at 80)). Therefore, "[a] claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract." *Hunt Constr. Grp., Inc. v. Berkley Assurance Co.*, No. 21 Civ. 2532, 2022 WL 17825813, at *3 (2d Cir. Dec. 21, 2022) (citation omitted); *see Ret. Bd. Of Policemen's Annuity & Ben. Fund of City of Chi. v. Bank of N. Y. Mellon*, No. 11 Civ. 5459, 2014 WL 3858469, at *3 (S.D.N.Y. July 30, 2014) ("[C]ourts confronted with such complaints under New York law regularly dismiss any freestanding claim for breach of the covenant of fair dealing where the claims derive from the same set of facts." (citation omitted)).

Here, Count Two alleges that Triller "actively sabotage[d] [Diamond's] ability to meet his contractual and fiduciary obligations to Triller," which "was intended to, and had the effect of, destroying or injuring Mr. Diamond's rights; namely, his right to compensation under the First and Second Director Services Agreements." AC ¶¶ 103–04. These allegations duplicate those in Count One—specifically, that Triller demonstrated an "ongoing pattern of excluding Mr.

Diamond and refusing to provide to him the relevant information necessary for Mr. Diamond to exercise his obligations under the [SDSA]." *Id.* ¶ 92. The Court thus dismisses Count Two as redundant. *See, e.g.*, *Hunt Constr. Grp.*, 2022 WL 17825813, at *3 (affirming dismissal of implied covenant claim as redundant of breach of contract claim); *Marcus*, 203 F. Supp. 3d at 340 (similar).

### C.    Count Three: Breach of the SGR

Triller next moves to dismiss Count Three, which alleges that Triller breached the SGR with Diamond. It argues that the SGR is not enforceable, and that, if it were, it is superseded and extinguished by the SDSA. Def. Br. at 17.

The requirements under Delaware law[10] to plead a breach of contract claim substantially track those of New York law. The complaint "must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *Madhu v. Socure Inc.*, 693 F. Supp. 3d 405, 419 (S.D.N.Y. 2023) (citation omitted) (quoting *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003)).

Triller argues that the SGR lacks consideration and thus constitutes an unenforceable gratuitous promise. It argues that Diamond's duties under the SGR are co-extensive with his duties as board chair, as set forth in the FDSA,[11] and that, insofar as the SGR binds Diamond to a preexisting duty, it does not create a binding contract. *See* Def. Br. at 17–20. Diamond counters that the additional shares of stock awarded in the SGR were consideration for his work facilitating the merger's completion and for work thereafter. AC ¶¶ 12, 48, 111. He notes that

---

[10] The parties agree that the SGR is governed by Delaware law. *See* Def. Br. at 17; Pls. Br. at 19.

[11] The SGR was ratified in August 2024, before the SDSA's effective date. AC ¶ 49. Therefore, the FDSA is the relevant contract in analyzing Triller's claim of a lack of consideration.

the AC alleges that the Board approved the SGR to ensure that Diamond did not resign before the merger closed, *id.* ¶ 109, and that Diamond fulfilled such obligations, *id.* ¶ 115. The SGR's text, Diamond notes, supports that his work bringing the merger to completion constituted consideration, in that meeting minutes state the shares promised Diamond were due after the merger closed. *See* SGR § 5.

The Court denies the motion to dismiss Count Three. The AC plausibly pleads that Diamond's obligations under the SGR exceeded those that he previously held. In discovery, Triller will be at liberty to factually test the proposition that Diamond's obligations with respect to the merger-in-progress were unchanged by the SGR. But that proposition—and Triller's claim based on it that the SGR is unenforceable—cannot be found on the pleadings. *See, e.g., Espire Ads LLC v. TAPP Influencers Corp.*, 655 F. Supp. 3d 223, 264 (S.D.N.Y. 2023) ("[B]ecause it cannot be concluded at this point that the Joint Venture Agreement was unenforceable, the motion to dismiss the breach of contract claim . . . is denied[.]"); *Rizzo v. DF Land LLC*, No. 13 Civ. 8664, 2014 WL 12560779, at *1 (S.D.N.Y. June 10, 2014) (denying motion to dismiss based on material issues of fact); *Brookfield Asset Mgmt., Inc. v. AIG Fin. Prods. Corp.*, No. 9 Civ. 8285, 2010 WL 3910590, at *6 (S.D.N.Y. Sept. 29, 2010) (same); *In re Avon Sec. Litig.*, No. 19 Civ. 1420, 2019 WL 6115349, at *15 (S.D.N.Y. Nov. 18, 2019) (same).

For much the same reasons, Triller's bid for dismissal of Count Three on the ground that the SGR's equity award was superseded and extinguished by the equity-award provisions in the SDSA fails. In discovery, Triller will be at liberty to test whether or not Diamond's and Triller's obligations under the SGR with respect to his eligibility for potential equity compensation are, as Triller claims, coextensive.

The Court accordingly denies the motion to dismiss Count Three.

26

### D.    Count Five: Breach of the LA

Triller next moves to dismiss Count Five, which alleges that its predecessor company AGBA breached the LA by not reimbursing Atlas for out-of-pocket expenses it incurred pursuant to and in reliance on the LA. AC ¶¶ 128–32. Triller seizes on the fact that the LA provision setting out the percentage of Atlas's out-of-pocket expenses that AGBA would pay was left blank. *See* LA § 1 (AGBA will "bear [X]% of all Transactions Expenses (as defined below), up to a cap of $1,000,000."). Triller argues that the use of an "X" reflects the absence of agreement on that material term, making the LA unenforceable. Def. Br. at 23.

That provision of the LA in which the "X" appears—setting out the percentage of Atlas's expenses for which AGBA would reimburse Atlas—is undeniably material. *See Major League Baseball Props., Inc. v. Opening Day Prods., Inc.*, 385 F. Supp. 2d 256, 271 (S.D.N.Y. 2005) ("Price or compensation are material terms in a contract requiring definiteness."); *Cleveland Wrecking Co. v. Hercules Constr. Corp.*, 23 F. Supp. 2d 287, 293–94 (E.D.N.Y. 1998) (collecting cases); *Cooper Square Realty, Inc. v. A.R.S. Mgmt. Ltd.*, 581 N.Y.S.2d 50, 51 (1st Dep't 1992) ("As price is an essential ingredient of every contract for the rendering of services, an agreement must be definite as to compensation.").[12] And were there no prospect of evidence arising that would reflect a meeting of the minds on that point, the LA would be unenforceable, because where "material terms are missing and there is no way for the court to fill in the missing terms with reference to an objective standard," the parties' contract "cannot be an enforceable agreement." *Foros Advisors LLC v. Digital Globe, Inc.*, 333 F. Supp. 3d 354, 362–63 (S.D.N.Y.

---

[12] A separate provision of the LA also uses an X in lieu of a specified percentage. Its exclusivity provision governs the percentage of total capital AGBA could invest to finance the transaction. LA § 2 (AGBA "shall have the right . . . to invest . . . an amount . . . representing not less than [X%] of the total capital . . . to finance the Transaction."). That provision is not implicated by Atlas's contract-breach claim. The Court does not have occasion here to determine whether that provision is material.

2018); *see also, e.g., Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 95 (2d Cir. 2007) ("To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." (citation omitted)); *Brookhaven Hous. Coal. v. Solomon*, 583 F.2d 584, 593 (2d Cir. 1978) ("To consummate an enforceable agreement, the parties must not only believe that they have made a contract, they must also have expressed their intent in a manner susceptible of judicial interpretation. If essential terms of an agreement are omitted or are phrased in too indefinite a manner, no legally enforceable contract will result." (citation omitted)).

Here, however, the AC alleges that the parties did have a common understanding as to that term. It alleges that the LA "was signed at a time when it was possible that there would be other parties involved in the potential acquisition," but that, "because only Atlas entered the Letter Agreement, it is entitled to reimbursement of 100% of its expenses." AC ¶ 129 n.4. In these circumstances, it is plausible that parol evidence exists that could be found to confirm the parties' meeting of the minds to that effect. *See Oxyn Telecomm., Inc. v. Onse Telecom*, No. 1 Civ. 1012, 2003 WL 22271224, at *4 (S.D.N.Y. Sept. 30, 2003) ("parol evidence may be received to explain ambiguous terms or to fill in terms," so long as the parol evidence does not contradict the written terms); *Sentry Ins. A Mut. Co. v. Brand Mgmt., Inc.*, No. 10 Civ 347, 2013 WL 5726143, at *2 (E.D.N.Y. Oct. 21, 2013) ("'[T]he parol evidence rule will permit the parties to offer extrinsic evidence of their intentions regarding an aspect of their agreement as to which their writing is silent or ambiguous.'" (citation omitted)). Atlas's claim to this effect is all the more plausible, in that contractual provisions reimbursing a vendor for its out-of-pocket expenses are customary, and, in the absence of participants in the transaction other than AGBA

(and its merger partner, now successor, Triller), such expenses would reasonably be borne by AGBA.

The Court accordingly denies the motion to dismiss Count Five. *See, e.g.*, *BAE Sys. Info. & Elec. Sys. Integration Inc. v. L3Harris Cincinnati Elecs. Corp.*, 716 F. Supp. 3d 206, 219–20 (S.D.N.Y. 2024) (denying motion to dismiss breach of contract claim despite agreement being "devoid of the material terms," where plaintiff "has plausibly alleged that any omitted or indefinite terms could be rendered certain with extrinsic evidence gathered during discovery"); *StandardAero Aviation Holdings, Inc. v. Signature Aviation Ltd.*, No. 22 Civ. 7515, 2024 WL 125574, at *4 (S.D.N.Y. Jan. 11, 2024) (denying motion to dismiss breach of contract claim in light of extrinsic evidence with capacity to bear on missing components); *Joseph v. Gnutti Carlo S.p.A.*, No. 15 Civ. 8910, 2016 WL 4764924, at *4 (S.D.N.Y. Sept. 12, 2016) (denying motion to dismiss breach of contract claim where extrinsic evidence had capacity to determine whether amount in settlement agreement encompassed taxes). Triller will be at liberty, at summary judgment, to move anew against this claim, if admissible evidence does not emerge that would support a meeting of the minds on this term.

### E.    Count Six: Quantum Meruit

Finally, Triller moves to dismiss, in part, Count Six, which brings a claim for relief in quantum meruit "to the extent that Plaintiffs provided the Company with services beyond the scope of the Agreements." AC ¶ 134. Triller seeks to dismiss the claim to the extent it covers services covered by the SDSA and the Atlas Advisory Agreement. Def. Br. at 24–25.

A plaintiff may alternatively pursue contractual and quasi-contractual relief, *see Phillips v. Reed Grp., Ltd.*, 955 F. Supp. 2d 201, 243 (S.D.N.Y. 2013) ("Rule 8(d)(2) of the Federal Rule of Civil Procedure permits a plaintiff to plead claims for breach of contract and, in the alternative, claims for quantum meruit."), but the existence of a valid contract bars recovery in

quasi-contract, *Bader v. Wells Fargo Home Mortg. Inc.*, 773 F. Supp. 2d 397, 414 (S.D.N.Y. 2011).

Count Six seeks recovery in quantum meruit for a range of services allegedly rendered over a 15-month period.  It pleads that Diamond and Atlas rendered "highly specialized and invaluable services to the Company, including . . . advising the Company on the Triller Merger," AC ¶ 135, and that AGBA (and later Triller) accepted those services between September 2023 and December 2024, *id.* ¶ 138.

To the extent that these services are covered by agreements whose validity is undisputed—including the SDSA and the Atlas Advisory Agreement—the claim for quantum meruit relief is barred.  However, it is premature at this stage—and Triller's motion does not ask the Court—to delineate the precise contours of the services covered by these agreements.  To the extent, however, that Triller has challenged agreements as invalid, it is premature to dismiss the quantum meruit claim based off those agreements.  Here, Triller has challenged the SGR, for a purported lack of consideration, and the LA, for the purported indefiniteness of its terms. Plaintiffs' claims based on those agreements have survived the motion to dismiss, but Triller's challenges to them remain.

The Court therefore grants the motion to dismiss the quantum meruit claim, to the extent based on services covered by the SDSA and Atlas Advisory Agreement, but denies the motion to dismiss that claim to the extent based on services covered by the SGR and the LA.  *See, e.g.,* *Boustead Sec., LLC v. Leaping Grp. Co.*, No. 20 Civ. 3749, 2021 WL 3774116, at *8 (S.D.N.Y. Aug. 25, 2021) (granting motion to dismiss quantum meruit claim as duplicative); *Fort Prods., Inc v. Men's Med. Clinic, LLC*, No. 15 Civ. 00376, 2016 WL 797577, at *5 (S.D.N.Y. Feb. 23,

2016) (same); *Green Star Energy Sols., LLC v. Edison Props., LLC*, No. 21 Civ. 2682, 2022 WL 16540835, at \*16 (S.D.N.Y. Oct. 28, 2022) (same).

## CONCLUSION

For the foregoing reasons, the Court (1) dismisses, in part, Counts One and Six; (2) dismisses in full Count Two; and (3) denies the motion to dismiss Counts Three and Five. The Clerk of Court is respectfully directed to terminate the motion pending at Dockets 13 and 18.

An order as to next steps in this matter will issue shortly.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: July 31, 2025
New York, New York